## NEW et al., Receivers, v. HUGHES.

No. 10072—Opinion Filed Jan. 8, 1921.

(Syllabus by the Court.)

1. Appeal and Error—Review—Questions of Fact—Action for Personal Injuries—Negligence.

Where, in an action for damages for personal injuries, the only controverted issue of fact is the negligence of the defendant being the proximate cause of the injuries received, and there is a preponderance of evidence showing such negligence, and this issue is submitted to the jury under proper instructions, a verdict for the plaintiff, which has been approved by the trial court, will not be disturbed, though the evidence as to such negligence is in conflict.

2. Appeal and Error—Review—Instructions.

Where a judgment is rendered and from an examination of the entire record it appears that the instructions to the jury complained of and requested instructions re-

fused, have probably not resulted in a miscarriage of justice nor constitute a substantial violation of a constitutional or statutory right, this court is powerless to reverse such judgment.

### 3. Railroads—Action for Personal Injuries —Verdict—Sufficiency of Evidence.

A careful examination of the record in this case discloses that there is sufficient evidence to support the finding of the jury on the ground of actionable negligence on the part of the defendant, the only question of fact involved in this case, that no reversible error intervened in the trial of said case, and that the verdict is not excessive and was not actuated by passion and prejudice.

Error from District Court, Hughes County; Geo. E. Crump, Judge.

Action by J. L. Hughes against Alexander New and H. C. Ferris, receivers for the Missouri, Oklahoma & Gulf Railway Company, to recover damages for personal injury. Judgment for plaintiff, and defendants bring error. Affirmed.

Arthur Miller and Jones & Foster, for plaintiffs in error.

Suits & Hall and Anglin & Steveson, for defendant in error.

COLLIER, J.  This is an action commenced by the defendant in error, J. L. Hughes, hereinafter called plaintiff, against the plaintiffs in error, Alexander New and H. C. Ferris, receivers of the Missouri, Oklahoma & Gulf R. Company, hereinafter called defendants, to recover the sum of $40,000 for alleged personal injuries due to negligence of the defendants.

The material evidence in the case is that the plaintiff was 35 years old and lived in and around Allen, Oklahoma; that he had a wife and three children; that he was a farmer, but for the last three years had been engaged in different kinds of work, making about $50 per month; that he was acquainted with defendant's depot and platform in Allen, Oklahoma.  That there was no means of approach to the depot with a wagon and team for the purpose of receiving and delivering baggage except along the north side of the platform between the platform and the main track, and this approach was used for the purpose of loading and unloading baggage. That the main track was straight for about a quarter of a mile west from the platform, and the coal chute was about a quarter of a mile west from the depot, and there were no obstructions between the coal chute and the depot. That the day of the accident he went to defendants' depot in Allen about 10 o'clock in the morning of November 30, 1916, for the purpose of getting baggage belonging to his mother-in-law; that he drove a span of mules, which he knew well; one of which he had driven about two years and the other about six months; that they were gentle

mules and he had never had any trouble with them nor knew of any one else having trouble with them; that they had been accustomed to being around the railroad and had never given any indication of being train shy.  That he drove in from the west side along the driveway beside the platform and up to the telegraph post where trains are supposed to stop, about 10 or 12 feet from the west end of the depot, and stopped in the driveway between the main track and the platform, and stayed there about 10 or 15 minutes searching for the freight agent to deliver the baggage; that as soon as he found him he loaded the baggage and started to drive out and heard the train coming and looked and saw the train coming from the west and knew he didn't have time to turn and drive out, which he would have to do in order to get out, which would be going toward the train; that the train was 150 to 200 yards from him when he first saw it, between him and the coal chute. That all this time the man on the engineer's seat, whom he supposed to be the engineer, was looking out of the cab window and directly towards him and his team; that he went to the mules and caught them by the bridle bits; that the train was coming very fast and making a lot of noise like shooting off steam—making more noise than a train usually makes in approaching a station; it was going "choo, choo," and the steam was escaping on all sides of the engine. That the noise of the train frightened his mules and they began to cut up and prance around and jerked him close to the track, but he got them stopped and quiet when about six feet from the track; that when he had about got them quiet the train blew two whistles, at which time it was about 10 feet from him. That just when he had his team stopped he glanced around to see where the train was and saw the engineer with his head out of the window of the cab, looking right at him and his team.  That the train was running about 25 or 30 miles an hour at that time and did not slow down. That when the whistle blew it scared his team; that his right hand mule made a lunge right around by the track and the train ran into him. That after the train whistled the mules made a lunge and threw him into the train after he had really gotten his team under control.  That at the time there was a large crowd at the depot, just in front of the depot, between it and the track.  That the pilot, a cross-piece which goes across the cow-catcher, struck him, and that after the train knocked him down he was unconscious and didn't know anything.

That as a result of the accident "all the toes of his left foot were cut off, two of his ribs knocked from his back-bone; that one rib was broken, and his knee bruised; that for a long time he could not put his weight on that leg; that his shoulder was also broken and his head gashed, which had to be sewed up.  (At this time plaintiff offered to exhibit his injuries to the jury, to which

defendants objected and admitted the injuries as alleged in plaintiff's petition.) That as a result of his injuries he was unconscious until about sundown of the day he was hurt. That he remained at Allen until Sunday morning, when he was taken to the hospital at Muskogee and remained there 51 days. That for the first month he was confined to his bed; that he continued to suffer and still suffers physical pain from his injuries. That before he was injured he was able to do all kinds of manual labor, was in good health, but since his injuries has not been able to do manual labor on account of them. That when he tries to work his foot breaks out and festers and runs; that his shoulder is all smashed up and has not gotten well, nor has his back; that he cannot lift as he could before his injuries; that he cannot operate a farm; that it was five months before he could do a lick of work, and since then he has not been able to do much; that he had to refuse a job because he was not able to do the work on account of his injuries; that he could not tell that his shoulder and back were improving at all. "The fact that I am not able to perform ordinary work, but have to limp when I walk, has caused and still causes me great mental pain and anguish," plaintiff testified.

On cross-examination, he testified that he had been to defendants' depot frequently, but had never driven a wagon and team to the depot before. That he didn't know the schedule of the trains, but knew that the passenger train was due at Allen about 10:10 a. m. That when he first saw the train it had left the coal chute and was about 250 yards from the depot; that when he got the mules by the bridle bits the train was about 150 yards away, coming rapidly; that the mules went toward the track going pretty fast; that they didn't go but a few steps when he stopped them about six feet from the track, at which time the train was about 10 feet from him.

I. M. Cummins testified: That he was about 63 years old; lived at Allen, Oklahoma, and was at the depot the day the plaintiff was injured; saw the passenger train come in from the west; it was down close to the coal chute when he first saw it, at which time Joe Hughes was up by the wagon and team. When he noticed the train it was making a great deal of noise; steam was flying out of each side pretty bad; it scared the mules and they started and Hughes ran and got them by the bridle bits and stopped them, at which time they were between the track and the platform, and then the train got nearer to the team, making more noise, steam boiling out on each side, whistled two short blasts. When the train whistled the mules attempted to run; they ran toward and down the track and the train right after them; that the plaintiff got the mules stopped for about a minute when the train got closer. It was blowing out steam on each side. The train knocked him down; his feet were un-

der the train. They got him out and carried him into the depot and he didn't know anything. That the first whistle was at the coal chute; that the people ran into the depot house and some of them toward the depot, but none of them went on the track. That when the train stopped, the front part of the engine was a little past the depot door, about 10 feet short of the usual stopping place. That when the train stopped, one of the mules was on the cow-catcher and the other mule was there by him.

Jesse Hayes testified: That for five years he had been city marshal of Allen; that when the engine got within 20 or 25 feet of plaintiff and the team, it whistled; he didn't know how many times, only it whisfled and whistled, at which time Hughes had hold of the left mule by the head and the right mule sprang forward and ran and threw Hughes under the train. That at the time the train whistled the team was standing still. The big beam on the cow-catcher was what hit Hughes. There were lots of people there, but no commotion; the people were standing by the depot, no one was on the track. That the engineer made an ordinary quick stop after he tried; that witness had been a railroad engineer for two years.

Lee Brunsfield testified: That he saw plaintiff at the depot of defendants the day he was injured; assisted him in loading some baggage; that he knew Hughes' team well; that he drove the team to the usual place for loading baggage; it was a gentle team of mules. That immediately they got the baggage loaded they heard the train coming up the track; plaintiff caught hold of the team by the bridle bits, and it was coming pretty fast; it whistled when it got at the cross street. The mules started toward the track; the plaintiff held on to them and got them about stopped, then the train whistled two or three times when it was about eight or ten steps from him; when it whistled the team lunged against him and got him up beside the train and the train knocked him loose. The plaintiff fell with his head on the track; the wheels of the engine passed over his toes; a big timber over the pilot hit him and knocked him unconscious; that the train began to slow down about the time it struck. That he had known the team for some time; that he had never heard of them running away or being fractious. That there was a crowd of people at the waiting room when the train whistled; that he didn't walk down toward the team, but stood in the waiting room. The train was coming in pretty swift. It was blowing off steam like trying to scare stock off the track. "shooting off sharply like it does when you first start."

The plaintiff, being recalled, testified: That his doctors' bills had not been paid; that Drs. Ross and Bullock attended him and that Dr. Bullock performed the operation on his foot and accompanied him to the hospital; that he had not paid or agreed to pay anything.

Jesse Hayes, recalled, testified: That he

was a local engineer three years prior; that he had worked as fireman six months and had some experience with air. That an engineer would have had time to stop the train; saw the train come up by the team and hit the plaintiff; that one can stop a train as quickly by air brakes when part of the air is already on as one can when he puts all of the air on at once; one can release the part he has on and then turn it all on and stop at once, as the emergency would take effect at once. That when he first saw the train it was near the Commerce street crossing; the team was excited; the people did not run toward the track; they didn't run in any direction, but started to the depot house for protection.

Upon the close of the evidence of the plaintiff, the defendants demurred to the evidence, which demurrer was overruled and the defendants excepted.

R. C. Roberson, witness for the defendants, testified: That he was a locomotive fireman employed by the defendants and was working for them firing a passenger train at the time of the accident to the plaintiff. The engineer was Mr. McMullen. That they were due at Allen a little after 10 in the morning, but were about 15 minutes late; that the coal chute is about 800 feet west of the depot; that they stopped at the coal chute as was their custom and then proceeded toward the station, going about 10 or 12 miles an hour into the station. That the engineer was driving the engine; that witness was standing on the left side of the cab, which was the opposite side from the station. That a Mr. McConley was standing talking to him, and that they had their hands on the bell cord ringing the bell for the station as the rules require; that the engineer shut off the steam about 200 or 300 feet from the depot; the throttle was shut; the engine whistled for the station somewhere near the coal chute; there were no other whistles sounded before he applied the brakes at the time the accident occurred by "giving her all the air" he could. That he had seen the team of mules around Allen for some time: didn't know whether they were gentle or not; they looked to be a little flighty; that he didn't see the mules on the morning of the accident until after the accident occurred; that he was on the wrong side; that the engineer had just applied the air and the engine whistled just one time after the air was applied; that the engine was stopped at the usual stopping place; that they didn't have any emergency on the engine and could not throw on the emergency at that time; that the engineer had applied the brakes; "that when you apply the air with the automatic brake that would make a rebound in your line and could not put them into emergency; that you can get the same amount of power, but it takes longer"; that the engine ran less than 60 feet after the plaintiff was struck.

J. M. McMullen testified: That he was a locomotive engineer employed by defendants; that he had been an engineer since 1900; that on November 30, 1916, he was working for the defendants as engineer on a passenger train, scheduled to arrive at Allen at 10:10 in the morning; that he thought it was cloudy when he got there, he was not sure; that they stopped at the coal chute, got coal before coming on to the station; that the coal chute was about 800 feet from the station; that the train then started up for the station and picked up about 10 miles an hour. That before he reached Commerce street he made a light service application of the air and they went on in; that he was on the right side of the cab, the side the station was on, looking ahead and saw the people there fixing to take passage; didn't see any one separately, just knew they were people on the platform, not on the track; that he didn't see the team of mules until he was almost to it; that the first time he saw the team was when they were at the end of the platform and had started toward the track, and that when he saw them he put on all the rest of the air; at that time the team quit running and he gave a warning whistle for the protection of the people on the platform and the man with the team; that after he applied the rest of the air the team ran about 60 feet; that he couldn't apply the emergency because a part of the air was already on. "If you want to apply the emergency, you must put on all the air, and if you release the air and then put it all on, it would be way past the station." That he did all that he could do and stopped as quickly as it could be done. That they were approaching the station at the usual rate of speed; that they came in at Commerce at about five or six miles an hour, and that he already had his brakes on; that he didn't see the mules until they started to run, when they were about even with the front of the engine; that they were not working any steam and the engine was not making a sound like "choo, choo"; that they didn't blow off any steam that morning. That when the team started to run they were between the telegraph pole and the platform; that they didn't stop until the accident was over; that they didn't sound the whistle after the team had stopped; that he was watching the team all the time after they started to run, had his eyes right on them; that he saw the man holding the team, he was looking right straight ahead, and the team came up between the platform and the depot and the telegraph pole; that he got so close to the engine that he caught the man between the mules and the breast beam of the engine. Plaintiff had hold of the left mule and was pulling on the head toward the train, and they got so close that they rolled him down between the engine and the mule. The mule was running faster than the engine. The mule circled right in front of the engine and plaintiff fell down then and the wagon passed over him. He fell with

his head out from the track and witness didn't know whether the wagon wheel or the engine wheel hurt his foot; that he never got off the cab until after he left the coal chute; kept his eyes down the track; that he was not going into the station blind, that he had his eyes on the station down the line. That he was watching everything down there. That he saw the team as soon as it started; kept his eyes on the team and saw every move it made. That when the steam is cut off and the engine is drifting, the engine does not make any popping sound and would not be throwing off steam. That the man and the team ran along with the engine about 40 feet before it was struck; "the team ran about 40 feet before we struck him."·

D. Wright testified: That he was a brakeman for the defendants and was on the train when the accident occurred at Allen; that he was on the rear steps as the train came in. The train stopped at the coal chute. Didn't think they were running over six or eight miles an hour as they came into the station; that he saw the team running along the platform; plaintiff was holding the mules by the bridle and the mules kept pulling in toward the track; that. the best he could tell from where he was, it seems the pilot beam hit the plaintiff and that put him between the engine and the mules until he passed the mules, and he fell with his feet toward the track; that the wagon wheel passed over his foot. "At the time the wagon wheel passed over him we had just about got stopped."

Dr. W. T. Tilley testified: That he was chief surgeon for the defendants; that he treated the plaintiff at the hospital at Muskogee; that when he came there he had his toes amputated; that there was a little scratch on his head with a couple of stitches in it; took about five or six days to treat him; he had no other injury, never complained of any broken ribs. He complained of general soreness for a few days; he had no broken ribs; he stayed at the hospital about a couple of months and was completely recovered of his injuries.

The jury returned a verdict in favor of the plaintiff in the sum of $12,500, to which the defendants duly excepted.

Thereupon the defendants timely moved for a new trial, which was overruled, and exceptions saved, and notice given of the intention of the defendants to appeal to the Supreme Court, and this appeal perfected.

The only errors assigned, argued, and insisted upon in defendants' brief are the giving of instructions numbered, respectively, 11 and 14, and refusing to give requested instructions, respectively numbered 5, 9, and 7, and the overruling of the motion for a new trial.

The given instructions 11 and 14 are as follows:

No. 11. "The court having just instructed you as to the legal test as to what constitutes proximate cause, it is your duty to receive said instruction as herein given and in applying it to the acts of the defendants which have been committed by the engineer in charge of said train, you are to view the same from all the facts and circumstances that an ordinarily prudent man would have seen at the time of the injury. And in this connection you are instructed that the engineer in charge of said train, situated as he was, with the plaintiff before him, with said team of mules, of which you have heard evidence, if the engineer, at the time, using the degree of care in the operation of said train which an ordinarily prudent man would have used under like circumstances and conditions, the defendant would not be charged in law with any acts of negligence with reference to the injuries complained of, although you may find by a fair preponderance of the evidence that plaintiff was injured as alleged in his petiton.

No. 14. "You are further instructed that if you find by a fair preponderance of the evidence that the plaintiff at the time of the injury was near the railroad track of the defendant and in such position as to be in danger of receiving injuries from the approaching train, and that the engineer of said train discovered plaintiff in such position, or by the exercise of ordinary care the engineer could have discovered that plaintiff was in such perilous position, and by the exercise of ordinary care could have avoided the injuries to plaintiff, as alleged in plaintiff's petition, and that said engineer did not use that degree of care that an ordinarily prudent man would exercise to slacken the speed or stop the same, to keep from injuring said plaintiff, and that such failure on the part of the said engineer to slacken the speed or to stop the engine was the direct and proximate cause of the injuries, as alleged in plaintiff's petition, then your verdict should be for the plaintiff."

The giving of instructions 11 and 14 were duly excepted to.

The requested instructions refused are as follows:

No. 5. "The court instructs the jury, that if you believe from the evidence that the defendants sounded their whistle as they approached the station of Allen, Oklahoma, at the time of the alleged accident, but that the same was sounded for the purpose of warning people who had surged out over the track, as the engine approached, of their danger in remaining in such positon and that no unusual sounds were made prior to that time by those in charge of the engine that might cause the plaintiff's team to become frightened, then you are instructed that no negligence was shown in this case and your verdict must be for the defendant, unless you believe from a fair preponderance of the evidence, that defendant's employes saw and appreciated plaintiff's position of peril in time to have avoided injuring him, and so seeing and appreciating his peril, failed to

exercise ordinary care to avoid injuring him."

No. 9. "The court instructs the jury that the burden is on the plaintiff to establish that he was rightfully on the premises of the defendants and that the mules attached to his wagon became frightened at the approach of the train, and the burden is further upon the plaintiff to establish that the enginemen in charge of said engine carelessly and recklessly caused said engine in their charge to make unusual noises in approaching said station, and that by reason of the said unusual noises so made plaintiff's mules became frightened and ran away, and unless the plaintiff has so established these facts, by a preponderance of the evidence to your satisfaction, your verdict must be for the defendant unless you believe from the evidence that the defendant's employes failed to exercise ordinary care to avoid injuring plaintiff after his danger was seen and appreciated."

No. 7. "The court instructs the jury that if you believe from the evidence that the plaintiff's team was standing unhitched and unattended when said train arrived, and becoming frightened attempted to run in front of said depot at Allen and along the platform in front thereof, and that said plaintiff in an attempt to stop same was thrown down on said platform and his foot crushed by the wheels of defendant's engine, and if you believe from the evidence that such conduct on the part of the plaintiff was contributory negligence, as that term has been defined to you in these instructions, and if you further believe that the employes of defendant exerted ordinary care to avoid injuring the plaintiff, after his position of peril was seen and appreciated, then your verdict must be for defendants."

The refusal to give each of the said requested instructions was separately excepted to.

The defendants having admitted that the plaintiff was injured as averred in the petition in this cause, and said averments in the petition being substantially shown by undenied evidence, there is left but one controverted fact in the case, viz., actionable negligence of the defendants, and such negligence being shown by a preponderance of the evidence, in the giving of instructions, complained of, and the refusal to give the said requested instructions, if a misdirection of the jury resulted, which we do not hold, we are satisfied, after an examination of the entire record, that the giving and the refusal to give said requested instructions have not probably resulted in a miscarriage of justice, nor constitute a substantial violation of a constitutional or statutory right. Section 6005, Revised Laws 1910.

We are of the opinion that each of the said instructions numbered, respectively, 11

and 14, correctly states the law, and that even if said instruction number 11 assumes a fact—"that the engineer saw the defendant prior to the action"—such assumption of fact does not render such instruction erroneous, as such fact is fully shown by the evidence of the defendant, and the evidence of the engineer, a witness for defendants, that he was looking at the plaintiff and saw the peril in which plaintiff was, and this evidence is not denied by any witness.

"Where, in the trial of a civil action, a material fact is testified to by one witness, and no witness testifies to the contrary, and such fact is not inherently improbable, either in itself or taken in connection with the circumstances, the jury is not at liberty to disregard such fact, and the court in its instructions may assume that such fact is established." Powelson v. State, 69 Oklahoma, 169 Pac. 1093.

We have carefully reviewed the entire instructions given by the court, and we are of the opinion that the requested instructions refused, when the instructions given are considered as a whole, are fully covered by the general instructions of the court, and therefore the court did not err in the refusal to give said instructions.

"It is not error for the court to refuse a requested charge when the same proposition is covered by the instructions given, which, taken as a whole, fairly submit to the jury the law applicable to the case." Holmes v. Halstid, 76 Okla. 31, 183 Pac. 969; Citizens Bank of Headrick v. Citizens' State Bank of Altus, 75 Okla. 225, 182 Pac. 657; St. Louis & S. F. R. Co. v. Fraser, 75 Okla. 265, 183 Pac. 478.

It is earnestly insisted by the defendants that the judgment rendered is excessive, and with this insistence we cannot agree, as the defendants admitted on the trial that the injuries averred in the petition in this case to have been received by plaintiff in this case are true, to wit: "That said locomotive and train of the defendant struck the plaintiff and his wagon and team and knocked him down and ran over him and seriously and permanently injured said plaintiff," as follows, to wit:

"That the wheels of said locomotive and cars ran over his left foot, mangling and mashing his foot until the greater part of said foot was thereby severed from his body, leaving only the heel and part of the ball of said foot; that plaintiff was seriously, painfully and permanently injured in his side, shoulder and back either by being struck by some hard object at the time he was knocked down and run over by said locomotive and train as herein stated, or by being thrown by the said locomotive and train violently against the railroad ties, cars and ground; that three of plaintiff's ribs

were thereby broken; that plaintiff's left shoulder and back were wrenched, strained, twisted and bruised, lacerated and skinned, and that said injuries to plaintiff's foot, side, shoulder and back are permanent and painful, and from which plaintiff will never recover. Plaintiff alleged that though more than 80 days have elapsed since said injuries were inflicted by defendants herein, as herein alleged, plaintiff still suffers great pain and misery by reason of said injuries to his foot, shoulder and back; that plaintiff's foot is almost useless; that the injuries thereto are painful and permanent; that he will never again be able to use said foot or to walk without the aid of a crutch or cane."

The defendants having admitted on the trial that the plaintiff was injured as averred in his petition, the only question of fact involved in this case is: Was there negligence on the part of the defendants which was the proximate cause of the injuries? There being evidence sufficient to support an affirmative answer, and the jury having so answered by their general verdict, and the jury having been properly instructed as to the law of the case, and the amount of damages awarded—$12,500—not being excessive, the court did not err in overruling the motion for a new trial.

The judgment of the trial court is affirmed.

PITCHFORD, JOHNSON, and HIGGINS, JJ., concur; HARRISON, McNEILL, and BAILEY, JJ., concur in conclusion.